Entered on Docket November 1, 2012

**Below is the Order of the Court.**



**Marc Barreca**
**U.S. Bankruptcy Judge**
**(Dated as of Entered on Docket date above)**

_____

# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| In re: **Manuel Sunday Gonzalez and Kristin Louise Gonzalez**, Debtors. | Case No. 10-23241-MLB |
| **John Boddy and Susan Boddy**, individually and their marital community thereof, Plaintiffs, v. **Manuel Sunday Gonzalez and Kristin Louise Gonzalez**, individually and their marital community thereof, Defendants. | Adversary No. 11-01139-MLB  **MEMORANDUM OPINION**[1] |

Plaintiffs, John and Susan Boddy ("Plaintiffs") filed the instant adversary proceeding against Defendants, Manuel and Kristin Gonzalez ("Defendant(s)")[2], requesting that various construction-

---

[1] This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rule of Bankruptcy Procedure 7025. To the extent findings of fact are set forth in the conclusions of law, or vice versa, they should be construed as though set forth in their appropriate respective sections.

Memorandum Opinion - 1

related debts allegedly owed to Plaintiffs by Defendants be declared non-dischargeable pursuant to 11 U.S.C. § 523(a)(2), (a)(4), and (a)(6).[3] At the beginning of trial, Plaintiffs withdrew their § 523(a)(2) and (a)(4) claims on the record. Trial was held on September 24, 2012, and closing arguments were presented on September 27, 2012. Plaintiffs were represented at trial by counsel, Joel Watkins. Defendants appeared *pro se*. Following trial, the Court took the matter under submission.

**JURISDICTION**

This is a core proceeding pursuant to 28 U.S.C. § 157(a) and (b). Jurisdiction is proper pursuant to 28 U.S.C. §§ 157 and 1334(b). Venue is proper pursuant to 28 U.S.C. § 1409(a).

**FINDINGS OF FACT**

<u>Bridle Tree Project</u>

Sometime in 2006, Plaintiffs obtained a loan from National City Mortgage ("NCM") to finance construction of a house known as Bridle Tree (the "Bridle Tree Project"). The Bridle Tree Project was in the early stages of construction when Plaintiffs discovered that their contractor, Bowtie Construction ("Bowtie"), was being investigated for alleged bad acts. Plaintiffs opted to end their working relationship with Bowtie. At that time, Plaintiffs stood to lose their "all in one" loan from NCM -- that was to take the Bridle Tree Project through construction and then convert into a regular mortgage -- unless they promptly secured another contractor. Robert Nitz of NCM suggested they contact Defendant regarding completion of the Bridle Tree Project. Plaintiffs contacted Defendant, and the parties entered into a contract for Defendant to complete the Bridle Tree Project (the "Bridle Tree Project Contract").

---

[2] Although both Manuel and Kristin Gonzalez are named defendants, only Manuel Gonzalez was directly involved in transactions with Plaintiffs. Thus, this opinion will frequently reference only "Defendant," referring to Manuel Gonzalez.

[3] Unless otherwise indicated, all Code, Chapter, Section and Rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et seq.*

Plaintiffs were very involved in the construction process. Mr. Boddy actually performed some of the construction himself, including electrical work, and he was often physically present while other work was being performed. Plaintiffs and Defendant had numerous in-person and e-mail conversations regarding the status of construction on the Bridle Tree Project.

Problems during the Bridle Tree Project caused the actual costs of certain items to exceed the contract prices (the "Cost Overruns"). The Cost Overruns included $5,000 for sheet rock, $8,923.40 for trusses, $2,312.08 for windows, and $6,092.38 for septic and drain field, totaling, $22,327.86. Plaintiffs acknowledged all of the Cost Overruns in an email to Defendant, dated October 11, 2007, taking exception only to the sheetrock since it had allegedly not been authorized for installation in the garage area. Defendant paid for the Cost Overruns on the Bridle Tree Project with the understanding that the Plaintiffs would repay him for the Cost Overruns (perhaps with the exception of the sheet rock) when the house was sold. This was also acknowledged in the same October 11, 2007 email from the Plaintiffs to Defendant. The Cost Overruns without the sheet rock total $17,327.86.

The Bridle Tree house was successfully completed, and eventually sold. Plaintiffs apparently did not pay Defendant for some or all of the Cost Overruns.

Fern Project

Several months after Defendant took over the Bridle Tree Project, Plaintiffs began negotiating with Defendant to build a house at Lot 3 Fern Lane NW, Bremerton, Washington (the "Fern Project"). In order to finance construction Plaintiffs again obtained a construction loan from NCM. On or about November 18, 2006, Plaintiffs signed a two page construction contract (the "Fern Contract") with Defendant to build the house for $284,600.00. The Fern Contract authorized Defendant to hire subcontractors provided that he "fully pay said subcontractor and in all instances remain responsible for the proper completion of this Contract."

Per the terms of the Fern Project construction loan, NCM required Plaintiffs and Defendant to sign a "Request for Disbursement/ Completion Certificate" (a "Draw Request") for each amount disbursed. Notwithstanding the requirement that both Plaintiffs and Defendant sign the Draw Requests, various Draw Requests appear to have been funded by NCM without obtaining Plaintiffs' signatures.

Each Draw Request contained the certification that funds disbursed:

> [w]ill be used to pay the cost of the identified property and improvements, including all suppliers, subcontractors, and/or laborers . . . [and that] available proceeds of the loan are sufficient to finally and fully complete and pay for completion of improvements, and that no suppliers, subcontractors, laborers, or other persons are claiming a lien against the property securing this loan.

Plaintiffs asserted that funds obtained from various of the Fern Project Draw Requests were not used to pay for the work specified and/or were applied toward the Cost Overruns on the Bridle Tree Project. Although the "paper trail" in the record is incomplete, the Court concludes that there is some merit to Plaintiffs' assertions. Defendant did take some funds from the Fern Project Draw Requests and apply them to balances owed on the Bridle Tree Project. In one instance, a lien was recorded against the Fern Project for septic installation even though a Draw Request had been taken on the Fern Project that included "septic." The Court did not find any instances where Defendant applied funds from the Fern Project Draw Requests to any projects other than the Fern Project or Bridle Tree Project, nor did the Court find any indication that Defendant improperly diverted funds from either project for personal gain.

At some point during construction Defendant began to experience financial difficulty. Plaintiffs agreed to advance certain costs of construction, with the understanding that Defendant would repay them from future Draw Requests. Defendant admits that he failed to reimburse the Plaintiffs for $5,531.16 for floor coverings, $7620 for cabinets, $2000 for plumbing finish, $4000 for electrical rough, and $3000 for electrical finish, and that he did not pay the bill for $13,000 for septic, all totaling $35,151.16. Although Plaintiffs alleged that they also had not been reimbursed for the plumbing rough

or for painting, the Court finds that Defendant had paid Plaintiffs $4,000 for the rough plumbing via Check #2416, and that the Plaintiffs had made a $6500 Draw Request on their own behalf to pay their painter.

As the Fern Project was nearing completion, Plaintiffs became increasingly dissatisfied with the pace of construction and their inability to communicate with Defendant. Plaintiffs sent Defendant numerous emails inquiring about progress on both the Bridle Tree and Fern Projects and urging him toward completion. On or about January 23, 2008, Defendant submitted a Draw Request for $49,500 to NCM. NCM sent an inspector to the Fern Project. The inspector deemed the Fern Project substantially complete, and NCM released the funds to Defendant. Defendant credibly testified that he used the $49,500 to pay outstanding bills related to the Fern Project. Aside from the single septic lien, Plaintiffs failed to prove that any bills remained unpaid on the Fern Project (other than reimbursements to themselves) or that there were any liens on the Fern Project. Plaintiffs allege that because Defendant did not prove exactly how he spent the $49,500 and that all of the funds were applied to the Fern Project, his act of taking the $49,500 pursuant to the Draw Request constituted "conversion." The $10,000 remaining on the construction loan was disbursed directly to Plaintiffs.

Defendant credibly testified, repeatedly, and the Court finds, that Defendant had no intent to injure Plaintiffs. The Court further finds that Defendant did not harbor malice toward Plaintiffs or know that any of his actions would cause them harm.

**CONCLUSIONS OF LAW**

"Debtors who file for bankruptcy under Chapter 7 are normally entitled to discharge unsecured debts." *Lockerby v.* Sierra, 535 F.3d 1038, 1040 (9th Cir. 2008). However, Code Section 523(a)(6) provides that a "discharge under section 727. . . does not discharge an individual debtor from any debt . .

. for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

"The malicious injury requirement is separate from the willful injury requirement. A willful injury is a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Albarran v. New Form, Inc.* (*In re Barboza*), 545 F.3d 702, 706 (9th Cir. 1998) (citations and quotations omitted; emphasis in original). The "willful injury requirement is met only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct." *Ormbsy v. First Am. Title Co. of Nev.* (*In re Ormsby*), 591 F.3d 1199, 1206 (9th Cir. 2010). "The debtor is charged with the natural consequences of his actions." *Id.*

"A malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse."*Albarran v. New Form, Inc.* (*In re Barboza*), 545 F.3d 702, 706 (9th Cir. 1998) (citations and quotations omitted). "Malice may be inferred based on the nature of the wrongful act." *Id.*

Notably, even an "*intentional* breach of contract cannot give rise to non-dischargeability under § 523(a)(6) unless it is accompanied by conduct that constitutes a tort under state law." *Lockerby v. Sierra,* 535 F.3d 1038, 1040 (9th Cir. 2008) (emphasis added). "Expanding the scope of § 523(a)(6) to include contracts that are intentionally breached whenever it is substantially certain that injury will occur would severely circumscribe the ability of debtors to 'start afresh.'" *Id.* at 1042. To determine whether conduct is tortious, the Court looks to state law. *See id.* at 1041.

In Washington, "[c]onversion is rooted in the common law action of trover and occurs when a person intentionally interferes with chattel belonging to another, either by taking or unlawfully retaining it, thereby depriving the rightful owner of possession." *Alhadeff v. Meridian on Bainbridge Island, LLC,* 167 Wn.2d 601, 619 (2009). Thus, to "prevail on a claim for conversion, a plaintiff must prove the

following elements: (1) that the defendant willfully interfered with a chattel; (2) that the defendant acted without lawful justification; (3) that the plaintiff was entitled to possession of the chattel, and (4) that the plaintiff was deprived of such possession." *Armijo v. Yakim HMA, LLC*, 2012 U.S. Dist. LEXIS 92346 at *9 (E.D. Wash. 2012). "Money may be the subject of conversion if the defendant wrongfully received it." *Alhadeff*, 167 Wn.2d at 619.

Plaintiffs have not demonstrated that Defendant converted any of the funds he received pursuant to the Draw Requests from the Fern Project. Some Draw Requests may have been improperly honored without Plaintiffs' signatures. However, Plaintiffs failed to prove that it was Defendant's responsibility (as opposed to NCM's responsibility) to obtain Plaintiffs' signatures on Draw Requests or that Defendant otherwise improperly received the funds from the Draw Requests.

Plaintiffs have failed to prove that, in receiving funds from Draw Requests and in some cases applying such funds to payment of subcontractors on the Bridle Tree Project, Defendant willfully interfered with chattel, acted without lawful justification, or deprived Plaintiffs of chattel to which Plaintiffs was entitled.

Further, this Court concludes that Defendant did not willfully and maliciously injure Plaintiffs. As indicated in the Court's findings, Defendant had no intent to injure Plaintiffs, did not harbor malice toward Plaintiffs, and did not know that any of his actions would cause them harm.

For the reasons set forth above, the debts owed by Defendants to Plaintiffs are dischargeable. The Court will separately enter a judgment in favor of Defendants.

/// END OF OPINION ///